UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TIMOTHY M. REED, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 10-1160 (ESH) |
| ) | |
| DEPARTMENT OF THE NAVY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION

Plaintiff Timothy Reed has sued the Department of the Navy, seeking monetary damages and injunctive relief for the allegedly improper disclosure of confidential records pertaining to plaintiff under the Privacy Act of 1974 ("Privacy Act"), 5 U.S.C. § 552a *et seq*. Defendant now moves the Court to enter summary judgment in its favor. For the reasons set forth below, defendant's motion is denied.

## FACTUAL BACKGROUND

Plaintiff Timothy Reed was enlisted in the United States Navy from November 1990 through January 1998, when he was honorably discharged. (Defendant's Statement of Material Facts ("Def. Facts") ¶ 1.) From March 1998 through May 18, 2009, he served in the Navy Reserve. (*Id*.) Plaintiff was simultaneously employed as a police officer by the Charleston Police Department from the spring of 2000 through May 2009. (*Id*. ¶ 2.)

In January 2009, plaintiff was mobilized to the Expeditionary Combat Readiness Center ("ECRC") in anticipation of being deployed to Iraq. (*Id*. ¶ 3.) While in specialized training at Fort Lewis, Washington, plaintiff was alleged to have engaged in various acts of misconduct. (*Id*. ¶ 4.) Defendant claimed that he pointed an M16 rifle at two other trainees while ordering

1

them to the ground; pointed a knife at another trainee and threatened to cut him; disobeyed an order; made a derogatory statement about a female officer; and made inappropriate comments about using force against Iraqis. (*Id.*) The Navy commenced disciplinary proceedings, conducting a Disciplinary Review Board ("DRB") hearing on January 30, 2009, during which plaintiff indicated that he was a member of the Charleston Police Department ("CPD"). (*Id.* ¶ 6.) Following the hearing, Command Master Chief David Carter contacted the CPD to confirm plaintiff's civilian employment. (*Id.* ¶ 7.) Over the course of three phone calls, CMC Carter made certain disclosures to the CPD regarding the pending allegations against plaintiff. (*Id.*)

Sometime in January or February, plaintiff contacted Lieutenant Kevin Boyd, his team commander at the CPD, and mentioned, without providing specific details, that there were "issues in [his] training." (Deposition of Lt. Kevin Boyd ("Boyd Dep."), Ex. E to Defendant's Motion for Summary Judgment ("Def. Mot."), 4:13-17.) Boyd notified Captain Tillman, his supervisor, about the call. (*Id.*) Plaintiff also called Mark Bourdon, an attorney for the CPD, and described the allegations again in vague terms. (Def. Facts ¶ 8.) CPD Chief Mullen decided not to take any action against plaintiff until the Navy's investigation was completed. (*Id.* ¶ 9.)

On March 12, 2009, plaintiff was found guilty at a "Captain's Mast" proceeding of having violated three provisions of the Uniform Code of Military Justice: disobeying a lawful order (UCMJ Art. 92), provoking speeches or gestures (UCMJ Art. 117), and assault (UCMJ Art. 128). (*Id.* ¶ 11.) Captain McKenzie, Commanding Officer of the ECRC, imposed non-judicial punishment ("NJP") on plaintiff, reducing his rank from First Class Petty Officer (E6) to Second Class Petty Officer (E5). (*Id.*) On April 13, 2009, plaintiff was demobilized (*id.*), and on May 18, 2009, he was honorably discharged from the USNR. (Complaint ("Compl.") ¶ 23.)

On April 13, 2009, plaintiff indicated to the CPD that he intended to return to work as a police officer. (*Id*. ¶ 12.) On the same date, Mark Bourdon contacted Navy Lieutenant Commander ("LCDR") Aimee Cooper to obtain information about the circumstances of Reed's separation from the Navy. (*Id*. ¶ 13.) Cooper informed Bourdon about the details of the allegations against plaintiff, the fact that he had undergone a psychological exam, and the disciplinary actions that the Navy had taken against him. (Plaintiff's Statement of Genuine Issues ("Pl. Facts") ¶ 13.)

On April 15, 2009, Bourdon asked LCDR Cooper to treat his email as a Freedom of Information Act ("FOIA") request. (Def. Facts ¶ 13.) On April 17, 2009, LCDR Cooper sent by email to Bourdon records of the Navy's investigation and the results of plaintiff's NJP. (Pl. Facts ¶ 13.) Cooper stated in an email to Bourdon that she believed what she had released "should be [ok]," while conceding that her supervisors did "not think so." (Ex. F to Def. Mot.)

On April 24, 2009, plaintiff was reinstated to his former position and rank at the CPD. (Def. Facts ¶ 15.) On the same day, CPD Lieutenant Anita Craven began an internal affairs investigation into plaintiff's alleged misconduct at the Navy, which CPD considered relevant to plaintiff's "fitness for duty." (*Id*. ¶ 13.) Plaintiff was placed on administrative leave with pay at that time. (Ex. 18 to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl. Opp.")) Lt. Craven interviewed plaintiff on April 24, 2009 and May 1, 2009. (Def. Facts ¶ 17.) Plaintiff told Lt. Craven that the weapons charges had been dropped. (*Id*. ¶ 18.) Upon Lt. Craven's request, plaintiff provided documents reflecting the NJP punishment and his demotion in rank. (*Id*.) He did not provide documentation regarding the proceedings and findings of guilt. (*Id*.) Plaintiff declined to sign a waiver to allow Lt. Craven to obtain the NJP records directly

from the Navy.  (*Id*. ¶ 18.)  On May 1, 2009, plaintiff was put on administrative leave without pay.  (Ex. 18 to Pl. Opp.)

On May 8, 2009, plaintiff submitted a letter of resignation to Lt. Boyd, which was accepted by Chief Mullen on May 11, 2009.  (Def. Facts ¶ 20.)  On May 21, 2009, the CPD completed its investigation with a finding that plaintiff had been untruthful during the course of the investigation and had acted to hinder the investigation.  (*Id*.)  No action was taken against plaintiff since he had already resigned.  (*Id*.)

Plaintiff filed suit against the Navy, alleging violations of the Privacy Act, 5 U.S.C. § 552a *et seq*.  He also sued the City of Charleston in federal court in South Carolina, alleging violations of the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. § 4301 *et seq*.  On June 8, 2012, on the eve of trial in the USERRA case, plaintiff stipulated to a voluntary dismissal with prejudice.  (*Id*. ¶ 19).

## STANDARD OF REVIEW

### I.   SUMMARY JUDGMENT

"Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *McKinley v. Bd. of Governors of Fed. Reserve Sys.*, 647 F.3d 331, 335 (D.C. Cir. 2011); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" and precludes summary judgment only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.

When considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Still, when the moving party has carried its initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). It may not rely on "mere allegations or denials," but rather "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (internal quotation marks and citation omitted). "[W]holly conclusory statements for which no supporting evidence is offered" will not suffice. *Carter v. Greenspan*, 304 F. Supp. 2d 13, 21 (D.D.C. 2004) (citing *Greene v. Dalton*, 164 F.3d 671, 674–75 (D.C. Cir. 1999)). A moving party is entitled to summary judgment if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## II.     PRIVACY ACT

When it passed the Privacy Act, Congress declared that "in order to protect the privacy of individuals identified in information systems maintained by federal agencies, it is necessary and proper for the Congress to regulate the collection, maintenance, use, and dissemination of information by such agencies." Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896. The Act provides agencies with "detailed instructions for managing their records and provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with the requirements." *Doe v. Chao*, 540 U.S. 614, 618 (2004). These detailed instructions and provisions for relief "protect[] individuals from injury that can result from the bureaucratic habit of collecting and retaining information, however dated, prejudicial, or false." *Dickson v. Office of Pers. Mgmt.*, 828 F.2d 32, 38 (D.C. Cir. 1987). "Put simply, the Act

'safeguards the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records . . . by allowing an individual to . . . ensur[e] that his records are accurate and properly used.'" *McCready v. Nicholson*, 465 F.3d 1, 7-8 (D.C. Cir. 2006) (quoting *Bartel v. Fed. Aviation Admin.*, 725 F.2d 1403, 1407 (D.C. Cir. 1984)).

Section 552a (g)(1)(D) of the Act creates a cause of action for any "adverse effect" from a "failure [by the agency] to hew to the terms of the Act." *Doe v. Chao*, 540 U.S. at 619 (citing 5 U.S.C. § 552a(g)(1)(D)). In actions brought under (g)(1)(D), the government will only be liable for "actual damages sustained by the individual as a result of the refusal or failure." 5 U.S.C. § 552a(g)(4). Privacy Act claims for monetary damages based on improper disclosure, which arise under "§ 552a(g)(1)(D), have four elements: "1) the disclosed information is a 'record' contained within a 'system of records'; 2) the agency improperly disclosed the information; 3) the disclosure was willful or intentional; and 4) the disclosure adversely affected the plaintiff." *Logan v. Dep't of Veterans Affairs*, 357 F. Supp. 2d 149, 154 (D.D.C. 2004). "The burden of proof lies with the plaintiff." *Cacho v. Chertoff*, 2006 WL 3422548 (D.D.C. 2006), at *4 (citing *Reuber v. United States*, 829 F.2d 133, 141 (D.C. Cir. 1987)).

## ANALYSIS

Plaintiff challenges two sets of disclosures in the instant suit: those made by CMC Carter during three phone calls with various CPD officers, and those made by LCDR Cooper during phone calls and in email exchanges with CPD Attorney Mark Bourdon. Plaintiff alleges that defendant violated the Privacy Act by willfully and intentionally disclosing information from the Navy's investigation of and disciplinary proceedings against plaintiff, which led to his constructive discharge from the CPD and difficulty in obtaining another law enforcement position.

For the purposes of this motion, defendant does not contest that disclosures were made by both Carter and Cooper. However, defendant contends that it is entitled to judgment as a matter of law because the undisputed facts reveal that Carter's disclosures were not derived from a "record within a record;" that Carter and Cooper's disclosures were permitted under the Department of Defense ("DoD") blanket "routine use" exceptions to the Privacy Act and the Navy's System of Records Notice ("SORN"), N01070-3; that any disclosures that may have fallen outside of the exceptions were not willful or intentional; and that the disclosures did not cause the adverse effect of constructive discharge, or that plaintiff is precluded from arguing that he was constructively discharged based on his stipulated voluntary dismissal of the USERRA case against the City of Charleston. While many of the facts are settled at this point, certain material facts remain in dispute, and as a result, the defendant's motion will be denied.

## I.     RECORD WITHIN A SYSTEM OF RECORDS

By its terms, the Privacy Act seeks to regulate the release of "any record which is contained in a system of records[.]" 5 U.S.C. § 552(b). Plaintiff alleges that defendant improperly released information derived from the Navy's records of investigation and discipline. (Compl. ¶¶ 24-27). Defendant claims, however, that CMC Carter's disclosures were based on his "independent knowledge," rather than review of an agency record, and thus are not covered by the Privacy Act (Defendant's Memorandum of Points ("Def. Mem."), at 7, referring to *Bartel*, 725 F.2d at 1411.) Plaintiff disputes this, highlighting that "[a]ll of the disclosures CMC Carter made to CPD occurred after CMC Carter had conducted the DRB and signed off on the memorandum to Reed's Commanding Officer." (Pl. Opp. at 12.) Since the record is not perfectly clear on this point, and one must construe the evidence in the light most favorable to

the plaintiff for the purposes of this motion, the Court cannot conclude that Carter's disclosures were not derived from "a record within a system of records," as defined by the Privacy Act.

## II. ROUTINE USE

"[T]he Privacy Act generally prohibits government agencies from disclosing personnel files" without the consent of the individual. *Bigelow v. Dep't of Defense*, 217 F.3d 875, 876 (D.C. Cir. 2000). However, an agency may properly disclose a protected record if one of a number of exemptions applies. 5 U.S.C. § 552a(b) (listing twelve exemptions). If plaintiff cannot establish that disclosure was improper, he cannot succeed under the Privacy Act as a matter of law.

The Privacy Act allows disclosure of records "for a routine use as defined in subsection (a)(7) . . . and described under subsection (e)(4)(D) . . . ." Section 552a(a)(7) defines a "routine use" as use "for a purpose which is compatible with the purpose for which [the record] was collected." Section 552a(e)(4)(D) requires agencies to publish "each routine use of the records contained in the system, including the categories of users and the purposes of such use" in the Federal Register. Thus, merely publishing the routine use in the Federal Register will not satisfy the Privacy Act. The use must also be "compatible" with the purpose for which the record was collected. *See U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers*, 9 F.3d 138, 144-46 (D.C. Cir. 1993); *Doe v. Stephens*, 851 F.2d 1457, 1466-67 (D.C. Cir. 1988) (holding that disclosing medical records pursuant to a grand jury subpoena was an invalid "routine use" because it would not be for a compatible purpose).

Defendant argues that the disclosures were compatible with the purposes for which the records were collected. It argues that the DRB records were collected to assess plaintiff's future status in the Navy Reserve and Carter disclosed information from those records "to collect more

potentially-relevant information" that would inform the same assessment. (Def. Mem. at 8.) The NJP records, according to defendant, were collected to memorialize the proceedings and to ascertain plaintiff's "fitness for duty" as a Navy sailor, and in turn, Cooper disclosed the records to assist the CPD in ascertaining plaintiff's "fitness for duty" as a CPD police officer. (Def. Mem. at 9.) Defendant posits that in both cases, the reasons for the disclosures were compatible with the reasons the records were collected.

Defendant argues further that the disclosures were authorized by the DoD's "law enforcement" and "requesting information" blanket routine use exemptions to the Privacy Act's prohibitions on disclosure. (Def. Mem. at 10-14.) The "requesting information" exception provides that a record may be "disclosed as a routine use to a federal, state, or local agency maintaining civil, criminal, or other relevant enforcement information…if necessary to obtain information relevant to a Component decision concerning the hiring or retention of an employee[.]" (Def. Mem. at 10 (quoting 32 C.F.R. § 701.112).) The "law enforcement" exception states that "where a record 'indicates a violation or potential violation of law, whether civil, criminal, or regulatory in nature…the relevant records in the system of records may be referred, as a routine use, to the agency concerned, whether federal, state, local, or foreign, charged with the responsibility of investigating or prosecuting such [a] violation.'" (Def. Mem. at 12 (quoting 32 C.F.R. § 701.112).) Defendant argues that the disclosures were also proper pursuant to the Navy System of Records Notice ("SORN") N01070-3, which authorizes disclosures to "law enforcement" agencies "in connection with litigation, law enforcement, or other matters under the jurisdiction of such agencies." (Def. Mem. at 11-12 (quoting 75 FR 19627).) More specifically, defendant relies on the "requesting information" exception and the

SORN to justify CMC Carter's disclosures, and on the "law enforcement" exception and the SORN to justify LCDR Cooper's disclosures.

There is little question that defendant has met the compatibility prong for LCDR Cooper's disclosures based on undisputed facts in the record. Plaintiff's argument that his "fitness for duty as a member of the military entails entirely different and unique considerations than those which are relevant to [his] fitness for duty as a civilian police officer" (Pl. Opp. at 16) is unavailing. There might, in a theoretical case, be considerations that would be unique to the Navy, however, the allegations that were investigated in this case – in particular, the use of abusive language and the threatened use of weapons – are equally relevant to whether an individual is fit to serve as a Naval officer or as a police officer. However, because of disputed facts regarding the scope of CMC Carter's disclosures, as discussed further below, the compatibility prong for those disclosures cannot be resolved on this motion.

Moreover, construing the facts in the light most favorable to plaintiff, the Court cannot grant defendant judgment as a matter of law on the question of whether either set of disclosures was authorized under the DoD's routine use exceptions or the SORN because there are factual issues that cannot be resolved without making credibility determinations.

First, the reasons for and extent of Carter's disclosures are in dispute. Carter has maintained that his only reason for calling the CPD was to verify that plaintiff was in fact employed by CPD as a police officer (Carter Declaration ("Carter Decl."), Ex. 3 to Pl. Opp. ("I was only attempting to verify that MA2 Reed was employed as a law enforcement officer."); Carter Deposition ("Carter Dep."), Ex. D to Def. Mot., 41:18-45:9, 62:1-63:20), and he has maintained that he did not and would not have mentioned any specifics about the allegations or about a mental health exam (Carter Dep. 66:1-14). Cooper's statements support Carter's account

(Cooper Decl., Ex. 2 to Pl. Opp. ("After confirming that MA2 Reed was a Charleston Police Officer, Master Chief Carter did not ask any further questions….Master Chief Carter did not discuss any specifics of the allegations with the Charleston Police Department.").) Yet, the testimony of several CPD witnesses, including Bourdon, Sgt. Robert Gamard, and Lt. Boyd, suggest that Carter did share the nature of the charges against plaintiff, including "something about pointing a weapon and a derogatory statement or slur that was made during training." (Boyd Dep., Ex. 1 to Pl. Opp., 12:3-7; *see also* Deposition of Sgt. Robert E. Gamard ("Gamard Dep."), Ex. G to Def. Mot., 10:13-19 ("he told me that Timothy was involved…in an incident that he pointed a firearm at some fellow trainees, and there were some allegations of some ethnic and racial slurs as well.").). And, notwithstanding Carter's testimony to the contrary, defendant argues that Carter's call to the CPD was intended to ascertain not only plaintiff's employment but also whether plaintiff had any prior disciplinary history with CPD.

Similarly, there are significant discrepancies between the deposition testimony of LCDR Cooper, her previous sworn affidavit, the deposition testimony of other witnesses, and the preserved email exchange between Cooper and Bourdon. There are unanswered questions about what precisely she disclosed to Bourdon and when she made those disclosures. Additionally, there is some dispute as to whether her supervisors authorized, or would have authorized the disclosures, and whether she was authorized to make the disclosures without approval from her supervisors. (Pl. Facts ¶13 ("LCDR Cooper responded four minutes later stating that her Immediate Superior in Command (ISIC), the denial authority for FOIA and PA wanted her to deny release"; "Mr. Bourdon asked if 'the stuff u sent ok?'….LCDR Cooper responded that it 'should be' but her command (i.e. 'higher ech[elon]') did not think so.") *but see* Bustamente Decl., Ex. K to Def. Mot. (identifying himself as the "Staff Judge Advocate for NECC, which is

the [ISIC] to [ECRC]" and stating "I am in agreement that any information that may have been disclosed by [Carter] or [Cooper] about Mr. Reed to the CPD would have been properly disclosed under the applicable [SORN] and the [DoD] blanket routine use exemptions.")

With these genuine issues of material fact in dispute, judgment as a matter of law is denied to defendant as to the question of whether Carter and Cooper's disclosures were exempt from the Privacy Act.

## III. WILLFUL OR INTENTIONAL DISCLOSURE

"[P]roof of intent or willfulness is a necessary element of [plaintiff's] claims, and failure to provide supporting evidence would lead to summary judgment in favor of the [government]." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007).  In this Circuit, intentional or willful means "so 'patently egregious and unlawful' that anyone undertaking the conduct should have known it 'unlawful.'"  *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (quoting *Wisdom v. Dep't of Hous. & Urban Dev.*, 713 F.2d 422, 425 (8th Cir. 1983)); *see also Tijerina v. Walters*, 821 F.2d 789, 799 (D.C. Cir. 1987) ("intentional or willful" conduct is "somewhat greater than gross negligence," demonstrating a "flagrant disregard" for rights the Act protects) (internal quotation omitted).

Defendant argues that CMC Carter's disclosures were not intentional or willful because he asked LCDR Cooper to be in the room when he called the CPD, precisely so that he would not inadvertently violate the Privacy Act.  (Def. Mem. at 15.)  While this argument has some appeal, the discrepancy between what Cooper and Carter recall that Carter said during the call,

and what CPD Lt. Boyd and Attorney Bourdon recall being said renders it impossible to decide this issue on summary judgment.[1]

As for LCDR Cooper's disclosures to Bourdon, there are even more ambiguities in the record that preclude a finding for defendant as a matter of law. On the one hand, Cooper discussed the possible applicability of the law enforcement exemption and perhaps the SORN with Bourdon. (Def. Facts ¶ 13, *but see* Pl. Facts ¶ 13.) On the other hand, Cooper conceded that her superiors did not believe that the information should be released, and it is unclear whether she had the ultimate authority to authorize the release without their approval (Pl. Facts ¶13). Additionally, it appears that she made oral disclosures prior to receiving a formal request from Bourdon, in violation of the SORN and DoD blanket regulations (Pl. Opp. at 9 (citing SECNAVINST 5211.5E para. 24(b) ("Navy regulation clearly provides that routine-use disclosures require a specific routine-use request")); prior to researching the case law on the Privacy Act (*id.* at 18, 20); and prior to consulting with her supervisors. Those disclosures, according to Bourdon, were fairly specific about the allegations and included the information that plaintiff had undergone a psychological exam. (Pl. Facts at 8 (citing Deposition of Mark Bourdon ("Bourdon Dep."), 20:7-8).) For all these reasons, defendant is not entitled to judgment as a matter of law on this issue, since credibility assessments are involved.

## IV.   ADVERSE EFFECT

"Plaintiff is entitled to civil remedies under § 552a(b) only if the violation had an 'adverse effect' on him." *Gamble v. Dep't of the Army*, 567 F. Supp. 2d 150, 155 (D.D.C. 2008). The plaintiff must allege "actual damages" *connected to* the adverse effect to "qualify" under the Act. *Doe v. Chao*, 540 U.S. at 620-27; *Mandel v. U.S. Office of Pers. Mgmt.*, 244 F. Supp. 2d

---

[1] Bourdon was apparently not present during the phone call but recalls that Capt. Tillman and Lt. Boyd afterwards recounted being informed about the allegation that plaintiff pointed a weapon. (Bourdon Dep., 9:7-10:25.)

146, 153 (E.D.N.Y. 2003) (holding that plaintiff must establish a "causal connection" between agency violation and adverse effect). Thus, plaintiff "must establish not only that he was 'adversely affected' by the improper disclosure, *but also* that he suffered 'some harm for which damages can reasonably be assessed.'" *Mulhern v. Gates*, 525 F. Supp. 2d 174, 181-82 (D.D.C. 2007) (quoting *Doe v. Chao*, 540 U.S. at 621).

Defendant makes three arguments for why it is entitled to summary judgment on the basis of the adverse effect prong. First, it argues that plaintiff resigned from the CPD and was not constructively discharged. (Def. Mot. at 18-21.) Second, it argues that even if he were constructively discharged, there is no causal link between the discharge and the disclosures because CPD would have initiated an investigation based on plaintiff's own phone calls to the CPD and the fact that he was returning unexpectedly early from his Navy mobilization. (Def. Mot. at 22-24.) Third, defendant argues that plaintiff is precluded from arguing that he was constructively discharged because he stipulated to voluntary dismissal of his USERRA case against the City of Charleston. (Def. Mot. at 24-27.) Each of these arguments is addressed below.

### A. Issue Preclusion

As a preliminary matter, plaintiff is not precluded from arguing constructive discharge. In this Circuit, the standard for issue preclusion requires that "(1) the issue is actually litigated and (2) determined by a valid, final judgment on the merits; (3) after a full and fair opportunity for litigation by the parties or their privies; (4) under circumstances where the determination was essential to the judgment, and not merely dictum." *Wash. Med. Ctr. v. Holle*, 573 A.2d 1269, 1283 (D.C. Cir. 1990). It is black letter law that "[i]n the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated." Restatement (Second) of

Judgments, § 27 cmt. e (1982). Other circuits, following the Supreme Court's decision in *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 327 (1955), have held that collateral estoppel does not apply in cases of voluntary dismissal with prejudice where the court makes no findings. *See, e.g., Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1159 (9th Cir. 2002), *Pelletier v. Zweifel*, 921 F.2d 1465, 1501 (11th Cir. 1991) (*abrogated on unrelated grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)), *Engelhardt v. Bell & Howell Co.*, 327 F.2d 30, 36 n.1 (8th Cir. 1964). In this instance, the issue of constructive discharge was not "actually litigated" in that the court in South Carolina did not make any actual findings on the issue. Therefore, plaintiff may continue to pursue his constructive discharge claim.

### B. Constructive Discharge

Although a resignation is presumed to be voluntary, "[i]n certain cases, the doctrine of constructive discharge enables an employee to overcome the presumption of voluntariness and demonstrate she suffered an adverse employment action by showing the resignation or retirement was, in fact, not voluntary." *Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010). In this Circuit, "a 'finding of constructive discharge depends on whether the employer deliberately made working conditions intolerable and drove the employee' out." *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1558 (D.C. Cir. 1997) (quoting *Clark v. Marsh*, 665 F.2d 1168, 1173 (D.C. Cir. 1981)). "The standard, moreover, is an objective one; that is, 'whether a reasonable employee would have concluded that the conditions made remaining in the job unbearable' and thus would have felt compelled to resign." *Kalinoski v. Gutierrez*, 435 F.Supp.2d 55, 78 (D.D.C. 2006) (quoting *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998)). "[A]bsent some indication that the employer was trying to drive the employee from the workplace entirely or that

the employee 'quit just ahead of the fall of the axe,' the law will not permit a resignation to be transformed into a discharge." *Id.*

In this case, plaintiff alleges that once he was put on administrative leave without pay, he "believed it was an inevitability he would be fired because, based on his experience with CPD, 'nobody goes on administrative leave without pay, or more or less, administrative leave with pay and is not [sic] going to stay there.'" (Pl. Opp. at 21 (quoting Deposition of Plaintiff Timothy Reed, 281: 16-22, Ex. 14 to Pl. Opp.).) Defendant counters that "it is standard procedure to place someone on administrative leave during an internal law enforcement investigation, and administrative leave pending an investigation is not the same as firing, otherwise CPD would have just fired Reed." (Def. Reply at 5-6). This does not, however, answer plaintiff's assertion that at the CPD an administrative leave inevitably precedes firing. Whether a reasonable employee would have come to the same conclusion that plaintiff did, based on the same knowledge of the CPD's disciplinary history, is a matter of dispute that requires further factual development and cannot be decided on this motion for summary judgment.

### C. Causal link

Defendant argues that "any disclosure by Carter of information regarding Reed's weapons charge is too tenuously linked to Reed's separation from the CPD to demonstrate an adverse effect," because plaintiff made calls himself to Lt. Boyd and Bourdon, which defendant argues would have triggered the CPD investigation in any case. (Def. Mem. at 22.) However, plaintiff argues that Carter's initial call to CPD predated plaintiff's calls, and triggered the CPD investigation. (Pl. Opp. at 23.) Construing the evidence in the light most favorable to plaintiff, it is reasonable to infer that Carter's call acted as a catalyst in the process that ultimately led to plaintiff's constructive discharge.

Defendant also suggests that it was plaintiff's dishonesty during the CPD investigation that led to an adverse finding against him (Def. Mem. at 23), which ignores that the investigation might never have been opened if Carter had not made the initial disclosures. Furthermore, plaintiff could viably claim actual damages independent of the constructive discharge (e.g., pecuniary loss from the leave without pay). As a result, defendant is denied judgment as a matter of law on this element of the claim as well.

## CONCLUSION

For the reasons stated, the Court will deny defendant's motion for summary judgment. A separate Order accompanies this Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date:   October 19, 2012